IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | 4:24CR3095 |
| vs. | | GOVERNMENT'S SENTENCING MEMO |
| CARLOS PADRON, | | |
| Defendant. | | |

## **Background**

Pursuant to a plea agreement, 36-year-old Carlos Padron ("Padron") waived indictment and pled guilty on March 23, 2026, to an Information alleging two Counts: 1) conspiracy to commit bank burglary and computer fraud pursuant to 18 U.S.C. § 371; and 2) intentional damage to a protected computer, pursuant to 18 U.S.C. § 1030(a)(5)(A), (c)(4)(B), and 18 U.S.C. § 2. (Filings 117, 119, 120, 123). Count I is punishable by up to five years imprisonment, and Count II is punishable by up to 10 years imprisonment.

Under the terms of the plea agreement, the government will move to dismiss the Indictment against Padron at the time of sentencing. (Filing 123, p.1). The parties have agreed to several offense characteristics/enhancements to include:

- 2-level increase: 10 or more victims. USSG § 2B1.1(b)(2)(A)(i);

- 2-level increase: relocation of scheme to avoid law enforcement or substantial part of fraud scheme committed outside United States or sophisticated means. USSG § 2B1.1(b)(10);

- 4-level increase: defendant was convicted of an offense under 18 U.S.C. § 1030(a)(5)(A). *Id*. at p.6.

Under the terms of the plea agreement, Padron may request or recommend additional downward adjustments or departures. (Filing 123, p.9). There are no objections or motions requiring resolution at sentencing, which is set for June 25, 2026, at 9:00 am. (Filing 127).

Padron's co-defendant, Oddry Torrealba ("Torrealba"), pled guilty to an Information alleging the same offenses Padron pled guilty to.[1] On June 11, 2026, Torrealba was sentenced to 78 months in prison followed by three years of supervised release. (Filing 139, p.2). Torrealba was also ordered to pay $1,537,696 in restitution. *Id*., p.6-7). The restitution order was "[J]oint and Several with any other defendants who are subsequently convicted in connection with this over-arching conspiracy, including but not limited to" Defendant and the defendants in case numbers 8:25CR190, 8:25CR242, and 8:26CR7. *Id*. Both Padron and Torrealba are part of a larger conspiracy to steal from ATMs in which over 100 defendants are charged in Omaha ("Omaha Defendants") across several Indictments. *See* 8:25CR190, 8:25CR242, 8:26CR7, 8:26CR25. Of the Omaha Defendants, one has pled guilty, and his case is set for sentencing in front of Judge Buescher on August 19, 2026. (8:25CR:190, Filing 402).

The probation office prepared a Revised Presentence Investigation Report (RPSR). Counts I and II group for guideline calculation purposes. RSPR ¶ 87. After applying reductions for acceptance of responsibility and zero-point offender, Padron's base offense level is 27 and his criminal history category is I resulting in an advisory sentencing **Guideline range of 70 – 87 months imprisonment.** RPSR ¶ 120.

---

[1] Padron's plea agreement differs from Torrealba's in that there is not an explicit agreement that conspiracy loss exceeds $3.5 million dollars. Given that there are no objections to the RPSR, the Government anticipates asking this Court at sentencing to adopt the RPSR in its entirety, and find that conspiracy loss is at least $3.5 million dollars based on the evidence in the RPSR. Consequently, as found by the RPSR, Padron is eligible for an 18-level increase to his base offense level pursuant to U.S.S.G. §§ 2B1.1(b)((1)(J). *See* RPSR ¶ 71, 88.

The government anticipates asking the court to adopt the RPSR in its entirety. For reasons that follow, the government seeks a **sentence at the high end of the advisory Guideline range along with an order of restitution**.

<u>Argument</u>

**A. 18 U.S.C. 3553(a) Factors – Nature and Circumstances of the Offense**

Facts underlying Padron's convictions warrant a significant prison sentence that falls at the high end of the advisory Guideline range. Padron played a critical role in the October 26, 2024 jackpotting attack at West Gate Bank in Lincoln. Specifically, he acted as driver and lookout while Torrealba unlocked the hood and manipulated internal components of the ATM to cause the unauthorized distribution of cash. RPSR ¶ 29. A week before his arrest, Padron purchased the van used in this attempted jackpotting attack. RPSR ¶ 31. Padron provided a cell phone to Torrealba. *Id*. Padron admitted they were out looking for an ATM. RPSR ¶ 32. Padron partnered with Torrealba, who participated in a month's long jackpotting spree of at least 17 jackpotting incidents across multiple states, resulting in a more than $1.6 million in loss. These facts reflect a coordinated, planned jackpotting attack by an individual deeply tied into the conspiracy.

In furtherance of the conspiracy, Padron and his co-conspirators took steps to avoid detection by both the banks and law enforcement. They wore disguises, donned face masks, used unregistered Facebook-purchased vehicles, and communicated using encrypted applications. They scouted out vulnerable victim banks, worked in the middle of the night, and used self-deleting malware to hide their tracks.

Padron's illegal actions had a ripple effect on these financial institutions. As a direct result of Padron's and Torrealba's conduct, not only did the victim banks suffer more than $1.6

million in loss, but the banks were significantly and financially impacted in additional ways. As merely one example, West Gate Bank branches in Lincoln spent over $23,000 to protect against future jackpotting by installing ATM locks and encrypting hard drives. In another example, the Washington State Employees Credit Union spent over $600,000 to pay armored vehicles to travel to all of the ATM branches around Seattle, Washington to empty ATMs of cash to prevent further thefts.

Additionally, investigating jackpotting attacks consumes significant time and resources from the law enforcement and banking communities. Each jackpot typically involved response and investigation from the victim banks, followed by response from local law enforcement, and then in some cases, further investigation by federal law enforcement. Frequently, smaller banks in smaller towns were targeted. The victim impact statement submitted by Dayspring Bank in Gothenburg, Nebraska (loss of $111,200 on April 12, 2025) is one such example showing a snapshot of the resources involved in simply initiating an investigation, determination areas of risk, and identifying solutions.

While it is true that the evidence to date has shown Padron "on the ground" at only one attempted jackpotting attack in Lincoln as described above, his bank records and chats reveal someone who is just as involved as his co-conspirator. RPSR ¶ 62-64. Bank of America records show large cash deposits into Padron's account between February 2023 through August 2024. The deposits occurred in multiple states such as New York, Florida, and Illinois. There is no evidence showing legitimate employment that would justify such deposits. The deposits were below the $10,000 threshold which is consistent with money laundering or avoidance of bank reporting. These deposits were followed by several Zelle transactions to pay coconspirators, launder ATM proceeds, and pay ATM jackpotting leadership. Bank records show known co-

4

conspirators in leadership positions depositing $1,000-$3,000 into Padron's account between 2023 – 2024. Bank records show Padron's involvement in the conspiracy began well before his arrest, spanned multiple jurisdictions and many months, was quite profitable, and revealed his ties to leadership in the conspiracy.

Padron's ties to conspiracy leadership are further evidenced by encrypted chat communications. RPSR ¶ 64. It is no coincidence that Padron was chatting with the engineer of the malware Anibal Canelon Aguirre ("Anibal") in October 2024, the same month Padron happened to get arrested in Lincoln. During the chat, Anibal instructs Padron how to configure a laptop.

In another encrypted chat, Padron chats with Aslhy Javier Galeano Basurto ("Galeano Basurto"), an indicted leader in the conspiracy, in what computer items to purchase related to ATM jackpotting. Further in the conversation, Padron sends Galeano Basurto an Airbnb booking confirmation for a house located in St. Louis, Missouri in October 2024, which happens to be close in time and within an hour's drive of two unsolved jackpotting attacks.

In yet another encrypted chat, in October 2024 Padron sends Daniel Eduardo Bastardo Torrealba ("Bastardo Torrealba"), an indicted leader in the conspiracy, his location near O'Fallon, Missouri. The chat occurs around the time of the two, unsolved jackpotting attacks referenced above. Padron tells Bastardo Torrealba that he already wrote down the six more that Bastardo Torrealba sent him. Investigators believe that Padron was referring to victim banks that Bastardo Torrealba is directing Padron to target. Padron's multiple communications with several of the highest ranking individuals in the conspiracy concerning topics consistent with jackpotting attacks reveals active and significant participation in the overall conspiracy.

**B. 18 U.S.C. § 3553(a) Factors – Torrealba's History and Characteristics**

Although Padron has no criminal history points, and therefore benefits from a two-level reduction for being a zero-point offender, he does have significant prior contacts with law enforcement. First, on December 21, 2016, Padron and seven others were arrested in Mexico where they were allegedly found to be in possession of approximately 57.6 grams of crystal methamphetamine and seven luxury brand watches. RPSR ¶ 103. Three vehicles were seized. Additionally, authorities were investigating the group for their presumed involvement in about 20 robberies in Guadalajara and Zapopan, Mexico. On an unknown date, the charges were dismissed. While not a conviction, this information shows prior contact with law enforcement well before Padron's involvement in the jackpotting conspiracy that did not deter his criminal conduct.

Second, on June 11, 2024, Florida agents arranged a controlled delivery of cash in connection with a money laundering investigation. RPSR ¶ 104. Padron and two others showed up at for the exchange. Padron had a loaded pistol in his waistband (19 rounds). By his own admission, investigators learned that he was present in the United States illegally. Investigators learned that on November 30, 2021, United States Border Patrol agents encountered Padron at or around San Luis, Arizona and arrested him for immigration violations. While not a conviction, this information also shows prior contact with law enforcement well before Padron's involvement in the jackpotting conspiracy that did not deter his criminal conduct.

To be clear, the government is not asking the court to treat these prior law enforcement contacts as convictions or to base its sentence on the facts that underlie these arrests. At the same time, the government believes these prior law enforcement contacts are relevant under § 3553(a) general sentencing factors to show that Padron's October 26, 2024, is not his first experience

with a criminal justice system. The timing of these contacts further shows he has not been deterred from further criminal conduct despite significant contacts with law enforcement prior to his involvement in this jackpotting conspiracy. Padron's prior contacts with law enforcement justify a high-end Guideline sentence.

### C. Loss and Restitution

The loss calculation for this jackpotting conspiracy has two primary purposes. First, in determining the offense conduct, the offense level is increased based on the amount of the loss. U.S.S.G. § 2B1.1(b)(1). Second, in the case of an offense committed by fraud or deceit or in which there is an identifiable victim, the Court shall enter a restitution order for the full amount of the victim's loss. U.S.S.G. § 5E1.1; *see also* 18 U.S.C. § 3663A(a)(1) and (c)(1). Although loss for sentencing purposes and loss for restitution purposes is often calculated in the same manner, the two determinations serve different purposes and thus may differ depending on the relevant facts. *United States v. Lange*, 592 F.3d 902, 907 (8th Cir. 2010).

For purposes of § 2B1.1(b), loss is calculated as the greater of the actual or intended loss. Actual loss is defined as the "reasonably foreseeable pecuniary harm that resulted from the offense." § 2B1.1 cmt. n.3(A)(i). "Reasonably foreseeable pecuniary harm" is further defined as that harm that the defendant knew, or under the circumstances, reasonably should have known, was a potential result of the offense. *Id*. cmt. n.3(A)(iv). Intended loss, by comparison, includes any "pecuniary harm that was intended to result from the offense," including harm that was "impossible or unlikely to occur." *Id*. cmt. n.3(A)(ii). Ultimately, this Court needs to make a "reasonable estimate of the loss." *Id*. cmt. n.3(C); *United States v. Rice*, 699 F.3d 1043, 1049 (8th Cir. 2012).

The Eighth Circuit has stated:

> In the case of a jointly undertaken criminal activity, relevant conduct includes all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity and that occurred during the commission of the offense of conviction. A co-conspirator's actions can count as relevant conduct, even if the defendant wasn't present when the crime occurred. The focus of our analysis is on the scope of the defendant's participation, not on the scope of the conspiracy as a whole. It is the Government's burden to prove the loss amount by a preponderance of the evidence.

*United States v. Miller*, 41 F.4th 1019, 1024 (8th Cir. 2022) (internal citations and quotations omitted). The Eighth Circuit has further held, "[i]f a conspiracy is effected while the defendant is incarcerated and he has not withdrawn from the conspiracy, his responsibility is curtailed only if those acts were not reasonably foreseeable at the time of his incarceration." *United States v. Maxwell*, 778 F.3d 719, 735 (8th Cir. 2015). Finally, the Eighth Circuit has held that where there is "a close relationship between" coconspirators, and the coconspirators have demonstrated a "substantial level of commitment to the conspiracy," other conspirators' actions in furtherance of the conspiracy are "reasonably foreseeable." *United States v. Lyons*, 556 F.3d 703, 707 (8th Cir. 2009) (*quoting United States v. Pizano*, 421 F.3d 707, 734 (8th Cir.2005)).

In Padron's case, the RPSR summarizes in detailed fashion that the conspiracy loss is over $3,500,000. This loss amount encompasses the loss directly attributable to Padron as set forth in the factual basis of his plea agreement, as well as the loss attributable to the larger jackpotting conspiracy. First, it encompasses attempted jackpot attacks in which cash was present in the machine, but not stolen (i.e., intended loss). Second, it encompasses loss tied to jackpotting attacks occurring after Padron's October 26, 2024, arrest, but before he pled guilty on March 23, 2026. Filing 120. Because further jackpotting attacks were reasonably foreseeable to Padron at the time he was incarcerated, and because there is no indication he withdrew from

the conspiracy until at least March 23, 2026, it is appropriate to hold him accountable for loss caused by codefendants, which, at the time of his plea, amounted to well over $3.5 million.[2]

As of this writing, at least five victim banks are seeking restitution. The government respectfully requests this court consider their victim impact statements, and enter a restitution order as part of sentencing that holds Padron jointly and severally liable with co-defendant Torrealba and all other subsequently convicted defendants in the overarching conspiracy for the entire amount of restitution, or $1,537,696.

## **Conclusion**

The government respectfully recommends that the Court sentence Padron to a prison sentence that falls near the top of the advisory Guideline range. At 36 years of age, and having been arrested for serious offenses in other jurisdictions, Padron partnered with a co-conspirator resulting in theft of more than $1 million from at least 17 ATMs across the United States. He avoided detection by using disguises, operating at night, and using self-deleting malware. He belonged to a larger conspiracy that was well-organized, and which later helped fund a designated terrorist organization, Tren de Aragua. He communicated with, and received money from, the very top of this criminal organization. A sentence at the top of the Guideline range will promote respect for the law, and will protect the public from Padron's theft and its impact on Nebraska communities.

Padron's sentence must include an order of restitution. The government asks this Court to consider all of the victim impact statements, including all restitution requests. As of this writing, the government agrees with a restitution order in the amount of $1,537,696 paid out to the five

---

[2] As of June 2026, investigators involved in the Nebraska-charged jackpotting conspiracy have documented well over $3.5 million in actual loss to victim banks.

banks that have requested restitution. The government has reviewed the proposed terms and

conditions of supervised release in the RPSR and has no objections to those terms.

UNITED STATES OF AMERICA, Plaintiff

Respectfully submitted,

LESLEY WOODS,
United States Attorney
District of Nebraska

By: *s/ Daniel Packard*
   DANIEL PACKARD, #21991
   Assistant U.S. Attorney
   487 Federal Building
   100 Centennial Mall North
   Lincoln, NE  68508
   Tel:  (402) 437-5241
   Fax:  (402) 437-5390
   E-mail: daniel.packard@usdoj.gov